602 So.2d 1327 (1992)
SOUTH END IMPROVEMENT GROUP, INC., a Florida Corporation, By and Through The BANK OF NEW YORK, as Trustee under the Will of C.J. Devine, Appellant/Cross Appellee,
v.
John H. MULLIKEN, Jr. John Good, William H. Moore, Peter Wick, Henry Field and Philip Nuttle, Appellees/Cross Appellants.
No. 90-3431.
District Court of Appeal of Florida, Fourth District.
July 15, 1992.
Rehearing and/or Certification Denied August 31, 1992.
*1328 L. Martin Reeder, Jr., and Elisa L. Fuller of Steel Hector & Davis, West Palm Beach, for appellant/cross appellee.
Patrick J. Casey and Daniel A. Hershman of Boose Casey Ciklin Lubitz Martens *1329 McBane & O'Connell, West Palm Beach, for appellees/cross appellants.
PER CURIAM.
This is an appeal and cross appeal arising out of a minority stockholder's derivative action. The Bank of New York, as Trustee under the Will of C.J. Devine, appeals from a final judgment determining that it lacked standing to bring a derivative suit on behalf of South End Improvement Group, Inc. against appellees, the directors of South End. The directors cross appeal the trial court's findings against them on the merits of the bank's action. We reverse on the standing issue but reject the claims on cross appeal.

FACTS
The bank, as trustee under the will of C.J. Devine, owns 204 (22%) of the outstanding shares and is the single largest shareholder of South End. Mr. Devine died in 1963. His will created a charitable residuary trust funded by the residue of the estate, which included the 204 shares of South End stock. The bank was named co-executor of the estate and the trustee of the residuary trust. In 1967, record ownership of the shares was transferred from Mr. Devine to the Bank of New York and John Lane as co-executors of Mr. Devine's estate. The estate was closed in 1971, but for reasons unknown, record ownership was not then transferred to the bank as trustee. Notwithstanding this, South End continued to communicate with the bank as shareholder, and permitted the bank to vote the shares at shareholders' meetings. Subsequently, record ownership was transferred to the bank as trustee, on April 13, 1989, after this action was initiated, but one year before the trial.
South End was incorporated in 1943 to supply water to certain residents of Jupiter Island. The company's most valuable asset is approximately 77 acres of unimproved property ("the land") located along the intracoastal waterway on the mainland across from Jupiter Island. The trial court found that the land was worth approximately $6 million, and that South End's other assets were worth only about $100,000 as of March 1988. In March of 1988, the directors unanimously approved a resolution to donate the land to the Fish & Wildlife Service of the United States Department of the Interior ("Fish & Wildlife"), subject to the approval of South End's shareholders. Under the directors' proposal, South End would receive no compensation from Fish & Wildlife, but would reserve an easement over the land to operate and maintain its wells and pipelines. The directors called a special meeting of the shareholders of South End to "authorize" the donation of the land. The bank attended the special meeting of shareholders for the limited purpose of objecting, pursuant to section 607.391, Florida Statutes (1987), to the validity of the notice and the meeting. The holders of 36% of the company's outstanding shares, a majority of the shares present and voting at the meeting, voted to approve the transfer.
Subsequently, the bank filed the subject derivative action on behalf of South End, seeking to enjoin the directors from wasting the company's assets. The directors adopted a resolution providing that South End would not convey the land to Fish and Wildlife pending the resolution of the bank's complaint.
After a bench trial, the trial court entered a final judgment which included findings in favor of the bank on all points except the issue of standing to bring the action. In a lengthy final judgment, it was found that the proposed transfer of the land to Fish and Wildlife was a disposition of "substantially all" of the property and assets of South End; that the notice of the special shareholders' meeting did not comply with section 607.241(2); that the directors' resolution to donate the land was not approved by an affirmative vote of the holders of the majority of the corporation's shares, as required by section 607.241(3); and that the record date set for the meeting did not comply with sections 607.087(2). The court further found that the donation did not serve a "reasonable corporate purpose" and that "the real purpose behind the proposed donation was to preserve the *1330 view of the Jupiter Island residents across the Intracoastal Waterway." The court nonetheless entered judgment in favor of the directors because it concluded that the bank did not have standing pursuant to sections 607.147, to bring the derivative action.

STANDING
Section 607.147, Florida Statutes (1987), sets forth a basic standing requirement for shareholder's actions as follows:
607.147 Shareholders' derivative actions security for expenses. In any action commenced or maintained by a shareholder of any domestic or foreign corporation to procure a judgment in its favor:
(1) It must be made to appear that the plaintiff was a shareholder or a holder of voting trust certificates at the time of the transaction of which he complains or that his shares or voting trust certificates thereafter devolved upon him by operation of law from a person who was a shareholder or holder of voting trust certificates at such time.
(emphasis supplied). Section 607.004(13) states:
(13) "Shareholder" or "Stockholder" means one who is a holder of record of shares in a corporation.
The trial court found that the bank, in its capacity as trustee, was not a contemporaneous holder of record of shares on the date the action was commenced or on the date that the property transfer had been authorized by the directors, and thus did not have standing. The bank contends that this definition of standing is too narrow and contrary to the equitable nature and history of derivative actions. We agree.
The rationale behind the contemporaneous stock ownership rule is to insure that a plaintiff has a legitimate stake in the corporation in order to adequately represent the corporation's interests in a derivative action. Schupack v. Covelli, 498 F. Supp. 704, 705 (W.D.Penn. 1980); Phillips v. Bradford, 62 F.R.D. 681, 685 (S.D.N.Y. 1974). In recognition of the equitable nature of derivative actions, courts interpreting derivative action statutes similar to section 607.147 have liberally construed such provisions to grant standing in a variety of factual settings without requiring "record" ownership.[1] The consistent rationale of these decisions is that the policies supporting the contemporaneous ownership rule are not advanced by denying standing to a proven owner of an equitable interest in shares. As the court in Gallup v. Caldwell, 120 F.2d 90 (3d Cir.1941) stated:
[The court is unable to perceive] why a clear title to shares of stock, with the immediate right to have the stock transferred on the books of the company, does not give the owner a right to the ear of this court to protect his interest in the corporation and its management.
120 F.2d at 94 (quoting O'Connor v. International Silver Co., 68 N.J. Eq. 67, 59 A. 321, 324 (1904), aff'd, 68 N.J. Eq. 680, 62 A. 408 (1905)).
Similarly, it is difficult for us to see any valid basis for denying the bank standing, since, at all times material, the bank was the legal owner of the shares, and has *1331 been for almost 30 years. In 1963, upon Mr. Devine's death, beneficial ownership of the shares automatically passed to the trust as a beneficiary under the will, and legal title passed to the bank as co-executor for purposes of administering the estate, and subsequently to the bank as trustee. Accordingly, prior to, and at the time of the events of March 1988, the bank held legal title to the shares and also represented, as fiduciary, the equitable title held by the trust and its beneficiaries. It would be difficult to conceive of a more substantial showing of "standing" for both legal and equitable purposes. The sole basis upon which the trial court's ruling rests, is the technical absence of a stock certificate issued in the bank's name as trustee prior to the transaction in question. Under the circumstances of this case we believe it would be putting form over substance to bar standing, given the bank's continuous ownership interest in the stock since Mr. Devine's death. As noted, after Devine's death the shares reflected the bank's legal interest as co-executor. Importantly, South End has at all times treated the bank as a "holder of record," providing it notice of, and allowing it to vote the shares at shareholder meetings.
The bank is a legal entity, just as a person is a legal entity. It is undisputed that the bank, as a legal entity, has had an ownership interest in the shares since Mr. Devine's death. The beneficial owner of the shares may have changed, in this case from the estate to the beneficiaries of the trust, but the bank's claim to a legal interest in the shares has not changed. The bank points out that any standing it has derives from its legal ownership of the shares, not from its fiduciary relationship to a third party estate or a trust, and that its status has really not changed since the death of Mr. Devine, which set in motion the bank's role with reference to the stock. We agree that the bank was entitled to standing under the statute.[2]
The bank also contends that it has standing under that portion of section 607.147(1) which confers standing when shares are acquired from a record shareholder by "operation of law." "Operation of law" means that the shares come to the transferee without any act or cooperation on his part. The concept has frequently been applied to situations where a plaintiff acquired title as a result of rights obtained through a will. Dawson v. Dawson, 645 S.W.2d 120, 123 (Mo. App. 1982) (shares devolved by will); Hirshfield v. Briskin, 447 F.2d 694, 698 (7th Cir.1971) (shares devolved as part of settlement of estate litigation; Phillips v. Bradford, 62 F.R.D. 681, 685 (S.D.N.Y. 1974) (shares devolved to plaintiff's father and then to plaintiff as beneficiary of 63.5% of father's estate). The concept is intended to protect the corporation from speculators who purchase shares for the specific purpose of bringing a strike suit. Dawson, 645 S.W.2d at 123. Despite the fact that some affirmative action was required in each case to accomplish the transfer of record ownership, the courts held that the transfers were sufficiently a "devolution by operation of law" to confer standing to bring a derivative suit.
We agree that the same result should apply here since it is clear that the bank has continuously held a real stake in the corporation, first as co-executor and then as trustee. While the will was the legal instrument giving the bank an interest *1332 in the stock, the transfer of the bank's role from co-executor to trustee was in essence "by operation of law" as opposed to any other kind of transfer. Importantly, in view of the bank's lengthy and continuous relationship with South End, the bank can hardly be described as a speculator or interloper in the affairs of the corporation.
For all of the foregoing reasons, we conclude that the trial court erred in holding that the bank lacks standing to bring the derivative suit.

CROSS APPEAL
On cross appeal the directors challenge the trial court's conclusions as to the decision of the directors to donate the corporation's land, and an evidentiary ruling of the court. We reject these claims, primarily because we conclude that there is a sufficient legal and evidentiary basis in the record to support the trial court's findings and rulings.
The directors claim that the trial court erroneously concluded that the donation of land was a disposition of "substantially all" the assets under section 607.241, Florida Statutes. The trial court found that the corporation's assets, including the land, were worth approximately $6,100,000 and that the land constituted 98% of this value. The directors contend that quantitative impacts of this magnitude do not trigger shareholder consent and dissenters' rights statutes, and cite to Schwadel v. Uchitel, 455 So.2d 401 (Fla. 3d DCA 1984) for this proposition.
In Schwadel, the corporation disposed of its only asset, an indirectly owned restaurant. Id. at 402-03. The court discussed qualitative concepts because the asset transferred was owned by a subsidiary. Id. at 403. In our view, Schwadel stands for the principle that a disposition of corporate assets may be considered "substantially all" if either its quantitative or qualitative impact, or both, would fundamentally change the nature of the corporation.
Other jurisdictions have considered both quantitative and qualitative factors in determining whether a proposed transaction triggers dissenters' rights. See, e.g., Gimbel v. Signal Co., 316 A.2d 599, 606 (Del. Ch.), aff'd, 316 A.2d 619 (Del. 1974); Campbell v. Vose, 515 F.2d 256, 259 (10th Cir.1975) (transfer of 33% of assets (all operating assets) was substantially all because transfer was last step in corporate reorganization); In re Multiponics, Inc., 453 F.2d 853, 854 (5th Cir.1972) (lease of 91% of acreage owned by corporation was substantially all); Katz v. Bregman, 431 A.2d 1274 (Del. Ch. 1981) (plant constituting over 51% of corporation's assets and generating 45% of sales was "substantially all" of its assets); Stiles v. Aluminum Products Co., 338 Ill. App. 48, 86 N.E.2d 887, 888 (1949) (sale of 64% of assets was substantially all); Prince George's Country Club, Inc. v. Edward R. Carr, Inc., 235 Md. 591, 202 A.2d 354, 359 (1964) (sale of assets, including land, valued at $1.13 million and a retention of assets worth $20,000 was sale of "substantially all" of assets).
Shareholder notice and consent requirements such as those contained in section 607.241 and dissenters' rights statutes such as sections 607.244 and 607.247 are intended to insure that directors do not fundamentally change the nature of the shareholders' investments without the check and balance of informed shareholder approval, and the opportunity for dissenters to withdraw from the corporation.
The directors assert that the trial court made no finding that the proposed donation of land would hamper the corporation's continuing water operations. However, the bank points out that although South End would continue to own the waterworks after the donation of the land, the transfer would be a fundamental change in the corporation because of the grossly disproportionate value of the land in comparison to the remaining waterworks. The record also reflects that the transfer could seriously jeopardize South End's water business. Whereas before the corporation could have sold or mortgaged part of the land to obtain the funds needed to replace the intracoastal main, that use of the land will be foreclosed by the donation of the land. Similarly, the donation of the land would deprive the corporation of the financial *1333 resources needed to pay for an alternative water source if a salt water intrusion problem, which the record reflects may currently exist, continues to worsen. These factors support the trial court's conclusion as to the drastic effect on the corporation of the proposed land transfer.
The directors also contend that the trial court should have concluded that the actions at issue here are shielded by the business judgment rule. The bank asserted two claims against the directors. It first claimed that they violated section 607.241, by disposing of substantially all of the corporate assets without proper shareholder approval. The bank also claimed that the donation of the land constituted corporate waste, and was therefore a breach of the directors' fiduciary duties as directors of the corporation.
The business judgment rule protects certain decisions of the board from scrutiny by the court if the board makes a good faith informed decision. The bank suggests that the business judgment rule is irrelevant to the issue of whether the transfer of the land is a disposition of "substantially all" the assets of a corporation, therefore requiring shareholder approval pursuant to section 607.241. The board may authorize a transfer of less than "substantially all" the corporate assets so long as the decision does not breach appellees' fiduciary duties to the company. In the case at bar, the trial court found that the proposed transfer was corporate waste, and that the directors breached their fiduciary duties because they acted in their own self-interest, rather than on behalf of South End, in approving the donation. Since this conclusion is supported by evidence in the record, we agree that no error has been demonstrated by the trial court in rejecting the directors' business judgment defense.
Finally, the directors complain that the trial court erroneously refused to exclude part of the testimony of an environmental expert presented by their opponents, Dr. Jay H. Exum, who allegedly trespassed on the land in question while the trial was proceeding in order to gain additional knowledge of the land. Dr. Exum was a known witness who visited the land twice to look for rare and endangered species and to evaluate the impact of environmental regulations on development of the site. The first visit occurred three weeks before trial and the second visit was on the first day of trial. The testimony in question pertained to the second inspection of the land.
The control of expert witnesses and their testimony is left to the broad discretion of the trial court. Binger v. King Pest Control, 401 So.2d 1310, 1314 (Fla. 1981); Acquisition Corp. of America v. American Cast Iron Pipe Co., 543 So.2d 878, 881 (Fla. 4th DCA 1989). Binger actually deals with use of testimony of a witness whose name has not been disclosed in accordance with a pretrial order requiring disclosure of all witnesses. The cross-appellants do not contend that Dr. Exum was a surprise witness or that they did not know the nature of his testimony. Dr. Exum's identity was actually disclosed weeks prior to trial, and the pretrial stipulation limited his testimony to rebuttal of Mr. Exner, as environmental expert, presented by the other side. Given the broad discretion granted the trial court under Binger, we find no reversible error by the trial court in allowing Dr. Exum to testify. Cf. Davis v. Pfund, 479 So.2d 230 (Fla. 4th DCA 1985), rev. denied, 491 So.2d 280 (Fla. 1986) (error to exclude expert testimony).
Accordingly, we reverse the trial court's decision in part, and affirm in part, and remand for further proceedings consistent herewith.
ANSTEAD, WARNER and FARMER, JJ., concur.
NOTES
[1] See, e.g., Edgeworth v. First Nat'l Bank of Chicago, 677 F. Supp. 982, 991-93 (S.D.Ind. 1988) (the income beneficiary of a trust, although not the legal owner of shares, has a sufficient equitable interest to have standing to bring a derivative action under Federal Rule of Civil Procedure 23.1 and under Indiana Law); Pearce v. Superior Court of Kern County, 197 Cal. Rptr. 238, 149 Cal. App.3d 1058 (1983) (a trust beneficiary has standing to maintain a derivative action under California law even though he is not the record or legal owner of any shares); Hurt v. Cotton States Fertilizer Co., 145 F.2d 293 (5th Cir.1944), cert. denied, 324 U.S. 844, 65 S.Ct. 679, 89 L.Ed. 1406 (1945) (a residuary legatee under a will disposing of corporate stock had a sufficient equitable interest to qualify as a "stockholder" for the purpose of bringing a derivative action notwithstanding that the executor retained power to sell the stock to pay the debts of the estate); Gustafson v. Gustafson, 47 Wash. App. 272, 734 P.2d 949 (1987) (pledgee of corporate stock had sufficient equitable interest to confer standing to bring derivative action notwithstanding requirement of rule of procedure that plaintiff must have been a "shareholder at the time of the complained of transaction"). Rosenthal v. Burry Biscuit Corp., 30 Del. Ch. 299, 60 A.2d 106, 112 (1948) (rigid definition of "shareholder" not necessary in arena of protecting corporate interests).
[2] The parties also dispute whether section 607.147 requires a plaintiff to be a shareholder when the action is commenced. The predecessor of section 607.147 expressly required a plaintiff to be a shareholder "at the time of the bringing of the action." The opening clause of section 607.147 now reads "in any action commenced or maintained by a shareholder" which, in light of the disjunctive, would seem to indicate that section 607.147 applies to actions commenced or to actions maintained by a shareholder. At least one Florida court has agreed in dicta that section 607.147 does not require a plaintiff to be a shareholder at the time the action is commenced, as long as he was one at the time of the transaction complained of. DiGiovanni v. All-Pro Golf, Inc., 332 So.2d 91, n. 5 (Fla. 2d DCA 1976). But see Schilling v. Belcher, 582 F.2d 995 (5th Cir.1978) (criticizing the DiGiovanni dicta). In this case, we need not decide this issue since we find the bank to have been a sufficient shareholder at all appropriate times.